Cite as 2021 Ark. App. 307

# ARKANSAS COURT OF APPEALS

DIVISION IV
**No.** CV-21-13

|  |  |
|---|---|
| | Opinion Delivered September 1, 2021 |
| CRYSTAL FOWLER<br>APPELLANT | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION |
| V. | [NO. 60JV-19-902] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | HONORABLE WILEY A. BRANTON, JR., JUDGE |
| APPELLEES | AFFIRMED |

## BRANDON J. HARRISON, Chief Judge

Crystal Fowler appeals a Pulaski County Circuit Court order terminating her parental rights to her child, IF. (The order also terminated the parental rights of IF's father, Al Coppak, but he is not a party to this appeal.) Fowler challenges both the statutory grounds for termination and the circuit court's best-interest finding. We affirm the circuit court's order.

On 7 June 2019, IF was born prematurely at thirty-one weeks and weighed three pounds. He and Fowler stayed at the hospital for several weeks following his birth. Fowler is married, but her husband is not the child's father and did not visit the hospital. On 2 July 2019, the Arkansas Department of Human Services (DHS) received a report that Fowler was incapable of caring for IF. Hospital staff said that Fowler exhibited "bizarre" behavior and had "trouble telling dreams from reality." DHS received reports that Fowler had

untreated mental-health issues, was homeless, appeared to have learning issues, and was not able to adhere to a feeding schedule for IF because she could not tell time. Fowler had no transportation and no appropriate baby items like a car seat, a crib, or a bed. Both hospital staff and counselors who had previously worked with Fowler in Morrilton opined that Fowler was not able to take care of herself, much less an infant.

Fowler told the DHS caseworker that she receives SSI due to a learning disability and that Kayla White, a social worker at UAMS, was helping her find housing. Fowler explained that she had received prenatal care in Oklahoma, where her father and stepmother live, but they had "dropped her off at [a] hotel in Morrilton" prior to IF's birth "because they did not want to deal with her and [IF]." Fowler initially claimed she was capable of taking care of IF but later acknowledged she needed help. The caseworker also spoke to Fowler's father who said that Fowler is "borderline mentally retarded" and that he "isn't sure if she is capable of taking care of an infant child."

On July 30, DHS exercised a seventy-two-hour hold on IF due to concerns about Fowler's lack of housing and failure to take medications as prescribed for her mental-health issues. DHS was granted emergency custody of IF, and the circuit court later adjudicated IF dependent-neglected due to neglect and parental unfitness by Fowler. The adjudication order specified:

> The Court finds that the child is dependent neglected and that the mother is not minimally fit or appropriate. . . . The primary issue with the mother seems to be mental health, as the mother stated she has schizophrenia, PTSD and bipolar. The mother had hallucinations and has been treated for threats of self-harm. The court is not saying that people with these diagnoses cannot parent, but in this particular case, it has caused some barriers. The mother does lack stable housing, but this could be in part to her current untreated mental health. The combination of mental health, emotional

2

concerns, and inappropriate plan does lead the Court to understand why the social worker made the phone call to the child abuse hotline. The Court is unsure if the mother is giving correct information or if the mother is capable of doing so. The Court needs more information on the mother's background.

The circuit court set the goal of the case as reunification and obtaining a permanent custodian including permanent custody with a fit and willing relative.

On 30 January 2020, the circuit court entered a permanency-planning order in which the court "hesitantly" accepted the goal of continuing toward reunification.

> The mother was appointed a guardian ad litem and it remains to be seen if she can parent a child or remain fit to parent a child. The goal of the case seems contrary to the fact that the mother has a guardian ad litem. Dr. DeRoeck, the Psychiatrist from Psychological Care Center, testified that he did a psychological evaluation on both, the mother (Crystal Fowler) and the father (Al Coppack [sic]). Regarding the mother, the Court cites directly from the Impressions provided by Dr. DeRoeck in the psychological evaluation (Petitioner's Exhibit 8):

>> Based on the evaluation, a probable learning disorder would be indicated. The assessment revealed a verbal comprehension score within the mild deficient range. Ms. Fowler's nonverbal IQ is within the low average range of intellectual development, however. Difficulty reading social cues and comprehension as well as social communication issues may be noted.

>> The overall assessment suggests an absence of alcohol or drug abuse issues, from her perspective. Though having a history of overuse of alcohol in the past, no self-medication issues were noted.

>> Ms. Fowler alluded to schizophrenia diagnostic consideration. Some mood swings and symptoms in excess of posttraumatic stress traits were identified. A rule out of schizoaffective disorder-bipolar type may be noted. Regardless, she is prescribed medication to attenuate hallucinatory activity. Some of the activity is associated with posttraumatic stress. She alluded to a history of abuse/trauma during developmental years with foster care placement.

She has a tendency to decompensate if under stress based on the overall assessment. She is not taking a mood stabilizer. No lability of mood was noted today, however. Close monitoring of her response to medications as well as assessing the possibility of benefitting from a [sic] mood stabilizers is indicated.

Ms. Fowler will require assistance in stress management. Developing more effective coping strategies would be helpful, as well.

Her capacity to deal with reality will determine her capacity to effectively parent. Close monitoring of her capacity to effectively function would be necessary. I believe slow reunification would be necessary due to her recent placement on medications and possibly being in need of other medications/treatment. However, with stabilization on medications and significant supports in place via family, etc., I believe there is evidence of the potential to effectively parent.

I believe it would be important to assess her understanding of what is asked of her in the ultimate care of [IF]. The possibility that she may not be able to care for him cannot be ruled out at this point.

Prognosis is guarded and dependent on her response to treatment.

Dr. DeRoeck testified that there are some concerns with the mother's parenting skills. Dr. DeRoeck recommended that the mother have close monitoring of her responses to medication; develop stress and anxiety management skills; participate in supportive counseling; supervised visitation to monitor her interaction with her child; and family planning and birth control education. Dr. DeRoeck did state that his report is guarded based on the mother's response to treatment and willingness to accept treatment. Currently, he did not note the mother being unwilling to accept treatment.

. . . .

Harrison Williams, therapist form HLH Consulting, testified that he sees the mother for therapy, and they have completed 21 sessions. The mother has officially completed therapy. However, Mr. Williams would be willing to continue seeing the mother should DHS request more sessions. Mr. Williams stated that the mother is working towards the goals and is

4

progressing. There are concerns with parent/child dependency, shelter, moving into her own place, and obtaining support. It will be important that the mother follows treatment goals. Mr. Williams is aware of the mother's PTSD and believes she could parent with PTSD. Mr. Williams has not seen the mother interact with the child but would be willing to observe visits, with DHS present.

The mother has obtained her own apartment and cleans at the apartment complex. She is currently paid in cleaning supplies. She is not currently on medication and does agree she needs to be on medication. She was having difficulties getting a PCP in Little Rock. The mother is actively participating in services, such as counseling, parenting and attending visits. Visitations are going well, though the mother does have difficulties understanding basic milestones the child must go through and maintaining focus on the child. . . .

The Court finds that the mother has made efforts to comply, but it remains to be seen if material progress has been made. It remains to be seen if mom can raise a child and stay fit to parent a child. At this time, the mother does not have the stress of raising a child as an added factor to the mother's life to know if she can handle the stress.

On 27 July 2020, the circuit court entered a second permanency-planning order, which changed the goal of the case to adoption with a concurrent goal of relative placement. The order recited that although Fowler had completed services, DHS did not believe it would be safe to return IF to her. The order also stated,

The mother testified that her mental health status would cause her to be unable to care for her child alone, though the mother testified that she also believes she could take care of her child alone. The mother testified she would have family support from her father and stepmother. The mother stated her family has not come to a hearing due to the long drive from where they live.

. . . .

The Court finds that the mother has complied with court orders and has been helped as much as she can be helped based on her mental health history of long duration. The mother is represented by a Guardian Ad Litem and if she is unable to stand on her own for court purposes, she is unable to meet minimal standards of being a custodian. In order to consider someone

5

as a custodian, the parent must be minimally fit and appropriate. The mother has improved her mental health condition since this case has started, but not to the point of being a custodian of this child.

The court encouraged Fowler to continue working on herself but did "not foresee at this point, given the mother's long history and mental illness, that she can be fit to take the child. . . . The best situation in this case would be established visits in which the mother can maintain a relationship." The court set the termination hearing for 8 September 2020.

On 30 July 2020, IF's attorney ad litem petitioned to terminate Fowler's parental rights citing statutory grounds of failure to remedy cause of removal, failure to remedy subsequent factors, and subjecting the child to aggravated circumstances. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*, (vii)*(a)*, & (ix)*(a)(3)(A)* (Repl. 2020). On August 31, however, Fowler, through her guardian ad litem, moved for additional time to pursue the concurrent goal of relative placement. Fowler asserted that, considering the psychological evaluations of relatives and adequate home studies that are expected to be introduced into evidence, it would be premature to proceed with the petition to terminate parental rights. She argued that the psychological evaluations had been received on 19 August 2020 and that the parties had not had time to implement the recommendations made by Dr. DeRoeck, the evaluating psychologist. Fowler specifically noted the psychological evaluation done on Catherine and Gary Crafton (Coppak's sister and her husband) as well as the ICPC ordered on Fowler's father's family in Lawton, Oklahoma, the result of which had not yet been received.

The circuit court convened a hearing on September 8 as scheduled. At the outset, DHS informed the court that it was not seeking termination of parental rights and that it

6

agreed with the motion for additional time to explore relative placement. The court reserved ruling on the motion and proceeded with the hearing. Angela Brown, an adoption specialist, testified that she had identified 213 potential families for IF, and she agreed that he is "easily adoptable."

Fowler testified that she had been living in Little Rock by herself for nine months and that her income was $783 a month in Social Security disability benefits. She explained that she was on medication for schizophrenia and bipolar disorder. She expressed a desire for IF to "come with my parents and be with my mom and dad through my family." When asked if she could take care of IF, she said, "Ten years ago, I couldn't, but now I think I can." If he could not be with her or her parents, she asked that IF stay with his foster parents because they are "nice" and IF "knows them more than anybody else." She confirmed that she is still married. On cross-examination, she agreed that she had completed services as ordered by the court. She said she was committed to staying on her medication and that she wished to continue counseling. She explained that because of COVID-19, her visitation with IF had consisted mainly of Facetime calls and that she had not seen him in person since his birthday on 7 June 2020. She agreed that she would like to have more time to be a part of IF's life.

Trevar Dye, the DHS social worker assigned to IF's case, testified that his recommendation was to allow more time to work with the parties toward a relative placement, specifically with Jamie and John Coppak (Coppak's brother and his wife). Dye said DHS was no longer considering Fowler's father as an option because he had indicated he was only willing to assist Fowler in taking care of IF. In addition, authorities in

7

Oklahoma had trouble getting in touch with Fowler's father, thereby delaying the home study. He agreed that Fowler had completed all the services offered to her but opined that she had not remedied the situation that brought IF into care because DHS "still had some concerns about her independently taking care of [IF] and doing that in a safe manner." Dye stressed that a "family connection" for IF was important to DHS, which is why he recommended pursuing placement with the Coppaks. On cross-examination, he also agreed that it was important for Fowler to have continued contact with IF, which could be facilitated with a relative placement but not with a stranger adoption. Upon questioning by the court, Dye agreed that the strongest bond that could be given to IF is an adoptive family rather than permanent placement with a relative.

Lanie Davis, IF's foster mother since his release from the hospital in July 2019, testified that IF had underdeveloped lungs and a suck-and-swallow issue, which necessitated feeding him on his side so he did not aspirate fluid into his lungs while drinking his bottle. He also experienced respiratory distress due to his underdeveloped lungs and had been hospitalized three times over the past year. She described his condition now as "pretty healthy" but said his lung issues will be a life-long condition that requires monitoring. She confirmed that she had supervised the Facetime visits with Fowler and that Fowler was "genuinely interested in her son during visitation."

From the bench, the circuit court ruled that the ad litem had proved all three statutory grounds alleged against Fowler and that adoption was in IF's best interest. Specifically addressing aggravated circumstances, the circuit court remarked that "it is unlikely that further services offered to these parents will result in a successful reunification

8

within a reasonable period of time as measured from a child's perspective and consistent with the child's developmental needs."

In its written order, the court found that Fowler had complied with services but was unable, due to her mental-health issues and low functioning, to be minimally fit to take care of IF. The court found that the conditions that had brought IF into care had not been remedied, that Fowler lacked the capacity to remedy the circumstances that had brought IF into DHS custody, and that there was little likelihood that services to Fowler would render her minimally fit to safely care for IF. The court also found that IF faced potential harm if returned to Fowler because she remained unfit and that IF is adoptable. The court explained that adoption is preferable in this situation because IF is a "one-year-old child who has his whole life ahead of him" and "needs to be in a long-term, peaceful placement." The court noted that interested relatives could still be considered as adoptive placements. Fowler has timely appealed the court's order.

In order to terminate parental rights, a circuit court must find by clear and convincing evidence that termination is in the best interest of the child taking into consideration (1) the likelihood that the child will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The circuit court must also find by clear and convincing evidence that one or more statutory grounds for termination exists. Ark. Code Ann. § 9-27-341(b)(3)(B). Only one ground is necessary to terminate parental rights. *Lee v. Ark. Dep't of Hum. Servs.*, 102 Ark. App. 337, 285 S.W.3d 277 (2008).

9

Termination-of-parental-rights cases are reviewed de novo. *Tillman v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 119. The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Williams v. Ark. Dep't of Hum. Servs.*, 2013 Ark. App. 622. In resolving the clearly erroneous question, we give due regard to the opportunity of the circuit court to judge the credibility of witnesses. *Camarillo-Cox v. Ark. Dep't of Hum. Servs.*, 360 Ark. 340, 201 S.W.3d 391 (2005).

Termination of parental rights is an extreme remedy and in derogation of the natural rights of parents, but parental rights will not be enforced to the detriment or destruction of the health and well-being of the child. *Friend v. Ark. Dep't of Hum. Servs.*, 2009 Ark. App. 606, 344 S.W.3d 670. The purpose of the termination-of-parental-rights statute, Ark. Code Ann. § 9-27-341(a)(3), is to provide permanency in a child's life in all instances in which the return of a child to the family home is contrary to the child's health, safety, or welfare, and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time, as viewed from the child's perspective. Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Shaffer v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 208, 489 S.W.3d 182.

Fowler first asserts that all three statutory grounds relied on by the circuit court allow a parent's rights to be terminated when the parent has failed to correct some deficiency or

10

impediment that prevents the return of the child to the home. In this case, the factual basis for all three grounds was that Fowler's mental health and mental capacity prevented her from appropriately parenting and successfully reunifying with IF. She argues that the testimony at the termination hearing, however, demonstrated that she had done exactly what was recommended—she had maintained a home for nine months and controlled her mental-health issues with medication. She had also taken parenting classes and expressed willingness to accept assistance from her family in caring for IF.

Fowler acknowledges that the caseworker testified that DHS still had concerns about her parenting abilities, but she argues that those concerns stemmed from instances that occurred at visitations when the case began and prior to the completion of services. Six months after IF's adjudication, the COVID pandemic necessitated that her visits switch to virtual, and DHS stopped supervising the visits. Fowler argues that in the six months immediately preceding the termination hearing, she had no hands-on opportunities to demonstrate the parenting skills she had learned and how she had benefited from the services provided. These circumstances, she asserts, support the argument that she be given additional time to demonstrate her improvements and for DHS to continue investigating relative placements. She contends that it was "complete conjecture" to say she had not benefited from services and that "[w]ithout more hands-on visitation or interaction, there was no way for anyone to formulate a fact-based opinion regarding any improvement in her ability to care for IF." Fowler also takes issue with the ad litem's failure to present relevant evidence from Fowler's counselor and argues that the circuit court was not given all the

"pertinent information" to determine whether she had benefited from services and could properly parent.

In response, the ad litem asserts that there was sufficient evidence to prove at least one ground for termination. He first discusses the aggravated-circumstances ground, which states that parental rights may be terminated when a court has determined that there is little likelihood that services to the family will result in successful reunification. He explains that the circuit court received testimony and exhibits throughout the case related to Fowler's life-long mental-health struggles and that the court's orders reveal an ongoing concern with Fowler's ability to improve her condition enough to successfully care for IF on her own. And at the time of the termination hearing, thirteen months after the case had begun, the caseworker agreed that there were no additional services that would help Fowler adequately remedy her situation. The ad litem contends that Fowler herself appeared to recognize her limitations because her first request was that IF be placed with her father and stepmother, and she never claimed that she was prepared to care for IF on her own. Considering IF's ongoing medical needs, Fowler's life-long mental-health issues, and the caseworker's agreement that there were no further services that would result in reunification, the ad litem asserts that the circuit court did not err in its finding of aggravated circumstances. He also argues that the same evidence supports the circuit court's failure-to-remedy finding.

We hold that the circuit court did not clearly err in its aggravated-circumstances finding. The evidence supports the circuit court's finding that further services would not result in a successful reunification within a reasonable period of time as measured from IF's perspective and consistent with his developmental needs. Fowler claims a lack of evidence

before the circuit court—specifically, information from her counselor—but she did not call her counselor as a witness nor did she call her father to affirm her plan to parent IF with his help. While the circumstances are unfortunate, this court is not left with a definite and firm conviction that a mistake has been made. Because only one statutory ground is necessary to terminate parental rights, we need not discuss the other statutory grounds.[1] *Lee, supra.*

As to Fowler's request for additional time due to COVID restrictions during the pendency of the case, the ad litem asserts that this argument is raised for the first time on appeal and therefore not preserved for our review. Alternatively, the ad litem contends that the request for more time was appropriately denied because a child's need for permanency overrides a parent's request for additional time to improve circumstances, and courts will not enforce parental rights to the detriment of the well-being of the child. *See McElwee v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 214, 489 S.W.3d 704. We hold that the circuit court did not err in denying the request for more time and that any COVID-specific argument was not raised or ruled on below. *See Perry v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 193, 625 S.W.3d 374 (holding that we will not address arguments raised for the first time on appeal, even in termination cases).

Fowler next argues that the circuit court's best-interest determination was wrong for two reasons: (1) insufficient evidence of potential harm and (2) the availability of less-

---

[1]Fowler argues, and the ad litem agrees, that the circuit court erred in basing its ruling in part on the subsequent-factors ground. The court's stated reason for its finding on that ground is that Fowler "lacked the capacity to remedy the circumstances that brought [IF] into DHS custody." We agree that this is not a sufficient basis for this statutory ground, but the error is harmless given our disposition of the case.

restrictive alternatives. She first contends that the same arguments that support reversal on the statutory grounds support a reversal of the best-interest finding. She notes that the caseworker did not think that she posed a risk of harm to IF and, on the contrary, believed it was in IF's best interest to continue contact with her and to be with relatives. Fowler also recites two less-restrictive alternatives that the circuit court could have and should have considered—reunification with her with an approved support system in place or a relative placement. She stresses that her father had been an option since the beginning of the case, but DHS had not properly considered him or other relatives that were available. Echoing her previous argument, she asserts that the case had been open only thirteen months and that "it would not have been detrimental to give [her] additional time for the home studies to be completed on all the relatives."

In support, Fowler cites *Benedict v. Arkansas Department of Human Services*, 96 Ark. App. 395, 242 S.W.3d 305 (2006), and claims that *Benedict* held that "it is proper and appropriate to allow additional time and services when parents are striving to be good parents, especially if the parent is hindered because of the parent's intellectual or psychological deficiencies."[2] And finally, Fowler stresses that it was the circuit court that

---

[2]The actual holding of *Benedict* is as follows: "We hold that on this record, where appellant has by all accounts cooperated with the orders of the court, benefited from the services provided by DHS, and shown objective improvement to the benefit of the children, the circuit court clearly erred in terminating appellant's parental rights." *Id*. at 412, 242 S.W.3d at 319. We also note that the appellant in *Benedict* suffered from postpartum

14

continued to list relative placement as a goal of the case but then terminated parental rights without receiving all relevant information on available relatives.

The ad litem responds that the same concerns that support the statutory grounds for termination also support the circuit court's potential-harm finding. Again, Fowler herself indicated that she could not care for IF alone as her plan was to take care of him with assistance from her father and stepmother. But the evidence throughout the case showed that her relationship with her father was not the most stable, considering he is the one who left her in Morrilton when she was about to give birth to IF, and he was not cooperative with Oklahoma officials in getting a home study done. And as noted above, Fowler offered no testimony from him at the hearing, so the court did not know the full extent of his willingness to care for IF.

As to other relative placements, the ad litem points out that the circuit court held open the possibility of a relative as an adoptive placement. The main goal of the court was to provide permanency for IF, and if relatives wanted to be considered in that process, they would have the opportunity to do so. But the circuit court's findings reflect the primary purpose of the Juvenile Code, which is to provide permanency and stability in a child's life when the child cannot be returned to the family home within a reasonable amount of time

---

depression that was eliminated through treatment over the course of the case, and the condition that led to her children's removal—neglect and a dirty and unsafe home—was remedied.

as viewed from the child's perspective.  Considering the facts of this case and IF's need for permanency, we hold that the circuit court did not err in its best-interest determination.

Affirmed.

GRUBER and MURPHY, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for appellant.

*Casey D. Copeland*, attorney ad litem for minor child.